(Superior Court of Cincinnati.—*Special Term.*)

THE FOURTH NATIONAL BANK OF CINCINNATI AND R. B. HOPPLE *v.*
CHARLES H. FLACH ET AL.

---

Charles H. Flach and R. B. Hopple were partners under the firm name of Hopple, Flach &
    Company. Subsequently they entered into an agreement by which the partnership
    was dissolved and the business passed into the possession and ownership of Flach, who
    assumed the payment of all the debts of the firm.
At the time this agreement was entered into, both parties supposed that Flach had suc-
    ceeded in making arrangement with certain banks the largest creditors of the old firm,
    to take the paper of Charles H. Flach in place of that of Hopple, Flach & Company.
    After the agreement between Flach and Hopple had been signed, the banks refused
    to take the paper of Charles H. Flach in place of Hopple, Flach & Company, the
    banks denying that any such arrangement had been made. Thereupon said Flach
    and Hopple, who was sick and entirely incapable, acting through his attorney pre-
    viously employed, agreed that said agreement should be considered of no effect.
Subsequently to this agreement of rescission, Charles H. Flach made an assignment for the
    benefit of his creditors.
Prior to the making of said assignment, Flach transferred certain accounts of Hopple, Flach
    & Company, to his individual creditors in payment of their debts, and transferred other
    accounts to certain creditors of Hopple, Flach & Company in payment of the debts
    of said firm. Neither the individual or the firm creditors had any notice of the
    agreement of rescission.
*Held :*   (1). That the transfers in payment of the individual creditors should be set aside.
  (2). That the transfers in payment of the firm creditors were valid.
  (3). That the assignment of an account is not required to be in writing. Mere delivery of
    the bills is sufficient.
  (4). That the right of the creditors and of Hopple, a partner, to have said individul trans-
    fers set aside, need not be asserted in the probate court.

(Decided March, 1895.)

---

SMITH, J.

Charles H. Flach and Richard B. Hopple were engaged in the whole-sale grocery business in this city under the firm-name of Hopple, Flach & Company.

VOL. 1—23*

Mr. Flach was older and a far more experienced man in the trade than Mr. Hopple. Mr. Hopple was a comparatively young man with considerable property inherited from his father and uncle.

The partnership was not successful, from either a personal or financial standpoint. The business lost money, and the partners, while never coming to an open rupture, seem to have had frequent controversies, growing out of the demand of Mr. Flach that Mr. Hopple should pay more attention to the business, and should put more money into the same.

Finally, towards the latter part of the year 1894, the partners began to negotiate with one another for the purpose of having either the one or the other become the sole proprietor and owner of the business by the purchase of the interest of his fellow-partner.

As the result of these negotiations, the partners on the eighth day of December, 1894, entered into the following agreement of purchase and sale of the business and dissolution of the firm, by which agreement Mr. Hopple retired from the business, and Mr. Flach became the owner of the same. The agreement was by consent, dated as of the tenth of December, and is as follows :

"This agreement, made this tenth day of December, 1894, by and between Charles H. Flach, party of the first part, and Richard B. Hopple, party of the second part, witnesseth :

"Whereas, the said parties are the sole owners of the property and business of the firm known as Hopple, Flach & Company, doing business at 42 West Second street, Cincinnati, Ohio ; and whereas, said parties desire to dissolve said partnership, the party of the second part retiring, and the party of the first part purchasing his interest therein,

"Now, therefore, said parties agree with each other, as follows, to-wit :

"*First.*—Said firm shall be dissolved and is hereby dissolved, to take effect the date of this agreement.

"*Second.*—The said Richard B. Hopple, party of the second part, retires from the said firm, and the said Charles H. Flach becomes the sole owner of the property and business of said firm, and agrees to pay its entire liability, including the notes discounted in bank for the said business or the business of the Standard Candy Company, which debts of Hopple, Flach & Company and the Standard Candy Company the said Charles H. Flach assumes and agrees to pay, and to save the said Richard B. Hopple harmless for any liability therefor.

"*Third.*—The said party of the second part agrees to purchase from the party of the first part the property and business of the Standard Candy Company, the tools, fixtures and machinery of said company to be sold to said party of the second part at a price fixed by the inventory taken in 1893, and stock, manufactured and unmanufactured, at cost price ; purchase price to be paid one-half cash, balance in thirty and sixty days ; notes to be given for the deferred payments, and the said party of the second part agrees to lease the premises of the said candy factory at the same rental and on the same terms as now held by the said Hopple, Flach & Company from the said Charles H. Flach, as guardian of Julia W. Hopple, said lease to continue until said ward arrives of age.

"*Fourth.*—The account of Mrs. Anna M. Hopple, mother of the party of the second part, is to be transferred to the party of the second part and to be treated as a part of the same ; and no claim is to be made against her or the party of the second part by reason thereof.

"*Fifth.*—Said party of the second part agrees that the said party of the first part shall have a lease of the store now occupied by Hopple, Flach & Co., No. 42 and 44 West Second street, Cincinnati, Ohio, for two years from the first day of January, 1895, at the present rental, with a privilege of

three years more at the expiration of said two years, and agrees that his mother and his wife will consent thereto, and his sister will consent there-to on her becoming of age.

"*Sixth.*—On the sale of the candy factory to the party of the second part, the party of the first part shall transfer all books and all other things connected with and a part of said business.

"*Seventh.*—This to be in full and final settlement of all matters between the said parties to date, and said party of the first part to publish the dis-solution of said firm, and to advise all creditors and customers of said firm of said dissolution and the retirement of the party of the second part from said firm, and said party of the first part agrees not to use the name 'Hopple' as a part of the name of the new firm.

"In witness whereof, the said parties have hereunto set their hands the day and year aforesaid.

"CHARLES H. FLACH,<br>
RICHARD B. HOPPLE."

Mr. Flach took no partner into the firm of Charles H. Flach & Company, he being the sole owner of the business of the same.

On the 14th of December, Mr. Flach published notice in the newspapers of the dissolution of the firm of Hopple, Flach & Company and the succession to its business of Charles H. Flach & Co. The publication was in the following language:

CINCINNATI, *December* 14, 1894.

"The firm of Hopple, Flach & Co. is this day dissolved by mutual agreement, Charles H. Flach assuming the assets and liabilities.

"CHARLES H. FLACH.<br>
R. B. HOPPLE.

"Charles H. Flach, having purchased the interest of R. B. Hopple in the firm of Hopple, Flach & Co., will continue the business under the firm name of,

"CHARLES H. FLACH & COMPANY,<br>
42 and 44 West Second Street."

On the evening of the thirteenth Mr. Hopple was removed to the hospital with a serious case of typhoid fever, and from that time up to the filing of this action, his condition of body and mind has been such as to prevent him from attending to business, and his physician has forbidden his testifying in this case.

The business of Charles H. Flach & Company was carried on until the second day of January, 1895, when the firm made an assignment under the insolvent laws, to L. C. Black for the benefit of creditors.

Prior to the assignment, but on the same day, Mr. Flach transferred certain book accounts which had belonged to Hopple Flach & Company, to the Western National Bank of New York in payment of its claim against Hopple, Flach & Company for money loaned the same; other book accounts he transferred to Arbuckle Brothers, of New York, in payment of their debt against Hopple, Flach & Company for goods sold the same; and other book accounts he transferred to D. A. White & Company, of this city partly in payment of the claim of said firm against Hopple, Flach & Company, and partly in payment of said firm's claim against Charles H. Flach & Company. He also gave a chattel mortgage on the stock in trade to the Lafayette National Bank of this city in payment of its claim against Hopple, Flach & Company for money loaned the same.

At the same time that these transfers were made to the creditors of the firm of Hopple, Flach & Company, Mr. Flach transferred certain book accounts which had belonged to the firm of Hopple, Flach & Company, to

Bertha Flach and to Charles H. Flach, guardian of Julia W. Hopple, to pay the personal indebtedness of Mr. Flach to said parties.

A transfer of book accounts which had belonged to Hopple, Flach & Company was also made to Mr. Charles Fleischmann for his claim of money loaned. But the question whether Mr. Fleischmann is a creditor of Hopple, Flach & Company, or of Charles H. Flach individually, is not to be determined by me at the present time, by reason of the absence of Mr. Fleischmann from the city, all parties consenting that such question, if in my opinion, it becomes important in this case, shall be determined at some future time.

On the fourteenth day of January, 1895, this action was begun in this court, by the Fourth National Bank and R. B. Hopple, against all the parties above named as preferred creditors, except the National Lafayette Bank, asking that the transfers aforesaid be set aside and a receiver appointed to take charge of the same.

The National Lafayette Bank having a chattel mortgage on property which passed into the possession of the assignee, it has been thought by counsel that the validity of such chattel mortgage could only be attacked in the probate court. But the bank has been represented here by its counsel, who has taken part in the proceedings before me, regarding the questions which are raised here in the attack upon the transfers made to the other creditors as the same which will be raised in the probate court in the attack upon the chattel mortgage.

While this trial was in progress, viz., on the twenty-eighth day of January, 1895, an assignment under the insolvent laws was made in the probate court by R. B. Hopple to Willis M. Kemper for the benefit of creditors.

The petition in this case is signed by the counsel for both the Fourth National Bank and Mr. Hopple, but was drawn by counsel for the former. It was hurriedly drawn after a somewhat hasty interview with Mr. McDougall, counsel for Mr. Hopple, and necessarily with a more or less imperfect knowledge of the actual facts of the various transactions connected with the signing of the contract, the conduct of Mr. Flach, both prior and subsequent to the signing of the contract, and the nature of the transfers made, and the facts relating to the same. The defendants, however, anxious to bring the case to an immediate hearing, have answered over without asking to have the petition made more definite and certain, or its separate causes of action, if any such are in the petition, separately stated and numbered.

The hearing, starting out upon the motion for the appointment of a temporary receiver, has, by consent of parties, developed into a trial of the case upon its merits, and the same will be finally disposed of by me upon this hearing.

The ground of the attack of plaintiffs upon the aforesaid transfers is stated in the petition by the allegations that the agreement of December 10, "never took effect, and was abandoned," and that therefore the entire property transferred to the preferred creditors by Charles H. Flach was the property of Hopple, Flach & Company, and not the individual property of Charles H. Flach, and that the transfers by operation of law, therefore, for reasons more fully stated hereafter, are invalid.

The phrase "never took effect, and was abandoned," when used with reference to the contract, is a contradiction in terms, and expresses contradictory facts. If the contract never took effect it could not be abandoned or rescinded, and the abandonment or recision of the contract necessarily implies that there was a contract to abandon or rescind; in other words, that, at some time, it did take effect.

But, as I have previously said, no motion being made to make more

definite and certain, evidence tending to support either hypothesis may be considered by me.

The contention of counsel for plaintiff that the contract never took effect, is based upon two grounds: First, that Mr. Hopple was induced to enter into it by the representation of Mr. Flach that the Fourth National Bank and the National Lafayette Bank, the largest creditor of Hopple, Flach & Company, had agreed with Mr. Flach that in case he bought the business of Hopple, Flach & Company they would take the paper of Charles H. Flach or Charles H. Flach & Company, thus releasing Mr. Hopple from any liability to these banks; that these representations were fraudulent, as Mr. Flach had no such arrangement with the banks, and was well aware of that fact, and that, therefore, the contract is void, or at least voidable at the option of Mr. Hopple, one of the plaintiffs herein, and having been avoided, the assets of the firm must first be subjected to the partnership debts of Hopple Flach & Company. Second, that if Mr. Flach's representation as to an arrangement with the banks was honestly made in a mistaken belief that he had such an arrangement, and the contract is not void or voidable at the option of Mr. Hopple, by reason of fraud in its inception, then it is void because entered into under a mutual mistake with reference to the arrangement with the banks.

I desire, however, to consider first the evidence on the subject of the recission of the contract and the legal effect of the the facts proven by such evidence.

But before proceeding to consider such evidence, I will state, without giving my reasons in detail, that I am entirely satisfied in my own mind that this contract was not entered into by fraudulent representations upon the part of Mr. Flach for the purpose, as claimed, of getting into his possession the assets of Hopple, Flach & Co., and then making an assignment and preferring his individual creditors, and the banks to whom false statements had been made. I believe that when Mr. Flach made the statements that he had arrangements with the banks, that he believed the statements to be true, and that, knowing the condition of the business as he knew it, he would not have signed the contract had he supposed he did not have such an arrangement, and, in view of the undisputed facts in the case, and the testimony of plaintiff's own witnesses, and entirely independent of Mr. Flach's own testimony, the theory that he signed the contract with the fraudulent purpose mentioned can not be maintained.

The evidence and circumstances to which I refer, are: First his knowledge of the condition of the business, and his knowledge, therefore, that unless the banks indulged him, he could not hope to succeed. Second, his intention to put ten thousand dollars of his wife's money into the business, as shown by the testimony of Mr. Frenkel; and his further intention, clearly proven, I think, to put ten thousand dollars of his own money into the business, which money he expected to receive from the sale of the candy factory. Third, his great reluctance and unwillingness to make an assignmen, as testified to by Mr Black. Fourth, his offer made to Mr. McDougall, after the refusal of the bank to renew the paper, to turn the entire business over to the Hopples, and put them in the same position as he was in; and a similar offer made in his place of business to Mr. White, of the Fourth National Bank.

I have thus briefly and generally stated my opinion as to the good faith with which Mr. Flach entered into this arrangement, not as a discussion of this claim of plaintiffs, but because the conclusion of fact which I have reached upon this question is an important circumstance in determining the questions of fact arising under the evidence tending to prove a recission.

On the fifteenth of December, just one week after the contract had been

signed, and five days from the date at which it was to take effect, the first note of Hopple, Flach & Co., held by the Fourth National Bank, fell due, and payment of the same was demanded of Mr. Flach, by Mr. White, the president of the bank. Mr. White refused to take the paper of Charles H. Flach & Company in place of Hopple, Flach & Company, and thus release Mr. Hopple, unless three conditions were complied with: First, an inventory of the assets and stock should be submitted by Mr. Flach to him, and the same should prove to his satisfaction that Mr. Flach had sufficient capital, with the addition of the twenty thousand dollars which he intended to put into the business, to make it a success; second, after the inventory was submitted to Mr. White, he intended to consult persons more familiar with the grocery business, and the result of this conference should be favorable; third, that Mr. Flach should prove himself worthy of credit.

Whether the latter requirement was in relation to the personal character of Mr. Flach, or to his financial standing, I am not able to say, and the evidence does not disclose it.

The fifteenth of December fell on Saturday, and at this date Mr. McDougall, who had been the attorney for Mr. Hopple, was out of the city, and did not return to his office until Monday, the 17th. On this date the Fourth National Bank demanded payment of a call loan of Hopple, Flach & Co., for $1,250; and Mr. Flach, after consulting Mr. Fleischman, and recognizing that it would be impossible for him to continue to carry on the business of Charles H. Flach & Company if the Fourth National Bank intended to demand immediate payment of its indebtedness as it fell due, called upon Mr. McDougall, who had been the attorney for Mr. Hopple at the time the negotiations were in progress, looking to the dissolution of the firm of Hopple, Flach, & Company, and who had drawn the agreement of December 10, 1894.

From the seventeenth of December, up to within a few days before the assignment, Mr. McDougall and Mr. Flach had frequent conferences in regard to the attitude of the Fourth National Bank. Mr. McDougall testifies that on the eighteenth he offered to Mr. Flach to rescind the contract in case Mr. White would not agree to carry the paper of Hopple, Flach & Company, as they had supposed he would when the contract was signed, and that this offer was accepted by Mr. Flach. Mr. McDougall's testimony is as follows:

"I then said to Mr. Flach that his (Mr. White's) demand, in my judgment, was quite reasonable, and that Mr. Flach should proceed to have the inventory taken; that no action would be taken by Mr. White and none should be taken by either him or myself, until that inventory was taken, so far as carrying out his agreement, which provided for the sale to Mr. Hopple of the candy factory. I told Mr. Flach that we were making arrangements for the raising of the money to carry out that part of the agreement, if it was to be carried out, by the ground rent on the property on Broadway. I believed that the money would be obtained on that. And he said to me that his check was ready for $10,000. And I said to him that no money would be put in and the agreement would not be carried out unless a satisfactory arrangement could be made by the banks. To which he assented."

Mr. Flach denies this conversation, but admits that on the seventeenth of December he made the following statement:

"I said to him that Mr. White was not doing what he agreed to do, and if he was not going to carry me, and was not going to give the same credit he gave the old firm, why it was impossible for me to go ahead with the business; I would have to quit."

It is not necessary to cite authorities to the effect that mutual promises constitute a good consideration for a contract, and it, therefore, follows

that if Mr. McDougall's testimony is true, and he had authority to make the offer he testifies was made, then, upon the happening of the event designated in the contract, viz., that no satisfactory arrangement could be made with Mr. White and the banks, the recission of the contract of December 10th, took effect as between Mr. Flach and Mr. Hopple, and the firm of Hopple Flach & Company was restored as to them, and as to third persons who did not deal with the firm of Charles H. Flach & Company bona fide and for value.

Whose statement is to be accepted as true, Mr. McDougall's or Mr. Flach's? Or does the one offset the other, and the burden of proof being upon the plaintiffs, the claim of recission fail?

It seems to me that the statement of Mr. McDougall must be accepted, for two reasons: First, Mr. McDougall stands unimpeached in any way as a witness, whereas the statements of Mr. Flach to the Lafayette Bank and the Western National Rank, seriously affect his credibility,    Second, the statement of Mr. McDougall as to what occurred, seems to me to be highly probable under the circumstances.    Whether the fact that Mr. Flach had the assurance of the banks that they would take his paper in place of that of Hopple, Flach & Company, was a condition precedent to the signing of the contract of December 10th, I do not say; but that it materially influenced Mr. Hopple in signing the agreement, I have no doubt.

When it was discovered by Mr. Hopple's attorney, therefore, that the banks would not act as it was supposed they would, and release him, and that, in that case, Mr. Flach would put no more money in the business, it seems to me highly probable that Mr. Hopple or his attorney should make the offer testified to by Mr. McDougall, and get the business back again into Mr. Hopple's control as a partner.

Third, it seems to me also highly probable that Mr. Flach should accept this offer. I have said before that in my opinion he honestly made the statement that he had received assurances from the banks and honestly believed that he had, and he knew then as he knew on the eighteenth, that unless a renewal of the paper held by the banks was had, failure was inevitable. He testifies, himself, that in that event he would have to quit. An offer, therefore, by the attorney of Mr. Hopple to relieve him of the entire burden of a failure, by rescinding the agreement of December 10th, and making Hopple liable also for the debts of Hopple, Flach & Company, must have received a prompt acceptance from him.

Did Mr. McDougall have authority to make this offer and thus enter into a contract of rescission?

His testimony on the subject of his authority to act for Mr. Hopple, given to him by Mr. Hopple before he was taken sick, is as follows: "I was employed by Mr. Hopple some time prior thereto as counsel in the matter of his interest in the firm of Hopple, Flach & Company, and in the matter of his desire to terminate the partnership either by purchase himself, or some other arrangement with his partner, Mr. Flach."

And again, upon cross-examination he testified as follows: "Q. Do you mean to say at that time, after you had come back from New York, and after Flach had told you they had signed this paper of dissolution, and dissolution had been advertised. Do you mean to say that you then had authority from your client at that time to agree to an arrangement of a rescission of that contract? A. Certainly, Mr. Colston, for this reason— Q. I do not care about the reason." And again, upon re-examination, he testified as follows: "Q. What did Mr. Hopple say to you with reference to him; with reference to this negotiation with Flach, at this interview before he was taken sick; before you went away when his sickness was on him? A. Why, Mr. Hopple told me repeatedly, during the negotiations, that he depended on me to see him through this whole matter of his connection

with the firm." There is no testimony in the case disputing Mr. McDougall's authority as he testifies it was given to him.

Mr. McDougall, therefore, being employed to negotiate and effect a transfer of Mr. Hopple's interest in the partnership to Mr. Flach, and it being discovered that one of the material inducements which operated upon the mind of Mr. Hopple had no existence, and that the contract could not be carried out as Mr. Hopple intended, it seems to me that, under the circumstances, Mr. McDougall had the right to agree, in the absence of Mr. Hopple, that the parties should be restored to the position they were in before the contract was signed, and that the power to so agree was necessarily incidental to his power to make a binding contract of transfer, and "to see Hopple through the whole matter of his connection with the firm."

Before proceeding to discuss the legal consequenses of this agreement between Mr. McDougall and Mr. Flach, it seems to me proper, at this time, while the subject of Mr. McDougall's authority is under review, to inquire what further authority, if any he had, to act for Mr. Hopple, other than that we have seen was given to him by Mr. Hopple before he was taken to the hospital, because such a determination becomes important in the future consideration of the case.

Any construction of Mr. McDougall's authority, given before Mr. Hopple's illness, which would authorize him to do more than transfer to Mr. Flach, or purchase from him Mr. Hopple's interest in the firm, with the incidental power above referred to, seems to me forced and unwarranted. Mr. Hopple himself never gave Mr. McDougall authority to make an assignment for him, or to manage for him the business of Hopple, Flach & Company, as Mr. Hopple himself could do as a partner of the same. The matter of an assignment was not contemplated when Mr. Hopple was well, and there is no evidence whatever in the case to support a claim that Mr. Hopple constituted Mr. McDougall his attorney in fact, or in law, to manage the partnership business for him.

What additional authority, if any, did he receive from Mr. Hopple, after he had been taken to the hospital? There is no competent evidence in the case that he received any. Mr. McDougall himself has never seen Mr. Hopple from the sixth day of December up to the present time. Between the seventeenth of December and the second of January, he saw his mother, his wife, and his father-in law, but these persons have not testified in the case, and neither has Mr. Hopple; and, if Mr. McDougall's testimony is to the effect that he was authorized by them, as the agents of Mr. Hopple, to act for him, as to which Mr. McDougall does not positively swear, still his testimony on that subject is mere hearsay. His agency for Hopple could not be proved by his testimony that these three persons said to him they were Mr. Hopple's agents and thereupon employed him. The three persons might have proved it, but not Mr. McDougall, who had never seen Mr. Hopple since the sixth day of December.

I am entirely unwilling however, to decide any question in this case upon a narrow or mere technical ground; and lest my finding just made may appear somewhat strict, it is only fair to all concerned to say that the plaintiffs themselves during the trial contended that these three persons were not shown, by legal evidence, to be the agents of Mr. Hopple, and, upon this ground, urged the exclusion of Mr. Flach's testimony as to a conversation he had with the ladies at the Burnet House. I sustained the objection to this testimony. I am satisfied that this ruling was correct.

I come now to consider the legal consequences that follow from the finding just made in regard to the agreement of rescission entered into on the eighteenth between Mr. McDougall and Mr. Flach.

It may be contended by defendants that, even assuming such an

.agreement to have been entered into, yet it could not have the effect to restore the firm of Hopple, Flach & Company; that such firm still existed until the agreement was carried out by Mr. Hopple, or his attorney, and Mr. Flach; and that at most it merely gave the one or the other a right of action for damages.

As far as third persons are concerned who have dealt with the firm of ·Charles H. Flach & Company *bona fide* and for value, I concede the contention to be sound.  As to other persons, I do not.

One of the most familiar, and, indeed, the main maxim of equity, is that equity regards that as done which ought to be done; and a reference to Pomeroy's Equity will be sufficient to illustrate the principle and show its application in the interests of justice to the varying circumstances of life.

In section 365 we find the following statement:

" Wherever, between two parties, A. and B., an 'equity' exists with re- .spect to a subject matter held by one of them, B., in favor of the other, A., then, as between these two, a court of equity regards and treats the subject matter and the real beneficial rights and interests of A., as though the ·'equity' had actually been worked out, and as impressed with the character and having the nature which they then would have borne.   When, in this proposition, it is said that an 'equity' exists between the two parties, the meaning is that some equitable obligation to do some positive act with respect to the subject matter, arising from a cause recognized by the rules of equity jurisprudence, rests upon B., and a corresponding equitable right to have the act done by B., with respect to the same subject matter springing from the same efficient cause, is held by A.   This active relation sub- ·sisting between the two parties, a court of equity, partly acting upon its fundamental principle of going beneath the mere eternal form and appearance of things and dealing with the real fact, the real beneficial truth, and partly for the purpose of making its remedies more complete, treats the resulting rights of A. as though the obligation of B. had already been performed, regards A., in fact, as clothed with the same ultimate interests in the subject matter which he would receive and hold if B. had actually fulfilled his obligation by doing the act which he ought to do.   Of course this interest thus possessed by A. is, and must be a purely equitable one, recognized by courts of equity alone, since no legal interest in the subject matter could become vested in A. except by the complete performance ·of his obligation on the part of B., his really doing the act which his duty bound him to do."

And, in section 373, speaking of the application of the maxim with reference to personal property and things in action, it is said:

" The operation of the grand principle that equity regards that as ·done which, in good conscience, ought to be done, is perhaps less immediate and evident in producing these species of personal property or interests, but is no less real and certain.   In all these instances an equity exists between the two parties, growing either out of an assignment, which at law, creates or transfers no property right, either present or future, in the subject matter, or out of an executory contract, which, at law, only creates a personal demand, a mere right of action and equity, laying hold of the ·obligation thus assumed by or imposed upon one of the parties, transforms it so to speak, upon the happening of the contingent event contemplated, into the real, beneficial, equitable ownership, property or interest, of what- ·ever nature and extent, absolute or qualified, it may be according to the terms of the instrument.   Thus the assignee of a possibility becomes equit- .able owner of the estate when the event takes place; the vendee of chattel to be acquired becomes their equitable owner; the equitable assignee of a fund becomes the real owner of the money; and from a mortgage or other

transfer inoperative as such at law, or from the mere executory stipula-
tions of an agreement, complete equitable liens upon specific lands, chat-
tels or funds are created."

In view of these principles it is evident that as between Mr. Hopple
and Mr. Flach, the firm of Hopple, Flach & Company came into existence
by agreement as soon as it was determined that the banks would not take
the paper of Charles H. Flach & Company in place of that of Hopple,
Flach & Company. It is true that Mr. Flach did not go to Mr. White to
have him formally refuse, but Mr. White had stated that he would not re-
new unless the inventory showed the assets with the addition of $20,000.00
to be sufficient to make the capital of the concern such that it could un-
questionably make a success of the business—that is, Mr. White was to be
satisfied that the new firm was solvent. But as the inventory disclosed the
fact that the new firm was hopelessly insolvent, Mr. Flach never returned
to see Mr. White. He knew that when the inventory was shown him that
his refusal would necessarily follow. The condition of affairs upon which
the agreement between Mr. McDougall and Mr. Flach was to take effect
had arrived, and the agreement, therefore, went into effect. The mere ab-
sence of a formal demand upon Mr. White, and a refusal by him, could not
in equity be considered as in any way affecting the rights of Mr. Hopple or
Mr. Flach. Equity does not require vain and useless forms to be observed
before it finds substantial rights to exist.

At the time, therefore, the transfers whose validity is in dispute here
were made, Mr. Hopple was entitled to all the rights of a partner in the
distribution of the same as against all persons who did not purchase
them *bona fide*, and for value, from Charles H. Flach & Company.

What were those rights ?

No proposition in the law of partnership is better settled than that the
assets of a partnership, as between the partners, must first be applied to
the payment of the partnership debts, and that the only interest in such
assets which a partner can assign in payment of his individual debt is the
surplus coming to him from such partnership business after all of its debts
have been paid. *Case* v. *Beauregard*, 99 U. S. 124; *Smead et al* v. *Lacey*, 1
Disney, 239. It therefore follows that the partnership creditors are pre-
ferred to individual creditors with respect to the partnership assets, and
that where one partner, without the consent of his co partner, uses the as-
sets of the firm to pay his separate creditor, such transaction is in contem-
plation of law a fraud upon the firm, and the transaction can not be upheld
unless such transfer was made *bona fide*, and for value.

The proposition is also well settled in this state that a mere pre-exist-
existing debt is not a valuable consideration which will support such a
transfer.

In *Lewis* v. *Anderson et al.*, 20 Ohio St, 231, it was held that where

"One partner of a manufacturing firm gave a mortgage on real estate,
of which he held the legal title, but which, in equity, belonged to the firm,
without any consideration other than to secure his pre-existing individual
debt to the mortgagee, who had no notice of the partnership or of the lia-
bilities of the firm then existing, that the lien of the mortgage on the prem-
ises was not superior to that of such prior liabilities of the firm."

The court, in that case, sums up its conclusion as follows, page 287 :

"It would seem, then, both upon reason and authority, that the holder
of a mere voluntary mortgage, to secure a pre-existing debt, without any
other consideration, is not entitled to protection as a *bona fide* purchaser."

It follows, from the foregoing discussion, that the transfers made to
Bertha Flach, and to Charles H. Flach, guardian of Julia W. Hopple, should
be set aside, and that this may be done, in this case, either at the instance
of Mr. Hopple, one of the partners, or at the instance of the creditors of

Hopple, Flach & Company, who derive their rights from the partner, and are allowed to assert the same as long as the partnership continues in existence.   *Case* v. *Beauregard*, 99 U. S. 124; *Fitzpatrick* v. *Flannagan*, 106 U. S. 655.

I come now to consider the validity of the transfers made to the Western National Bank and Arbuckle Brothers.   These parties are conceded to be firm creditors, but the transfers to them are attacked upon two grounds:

*First*—That one partner has no right, without the assent of his co-partner, to make transfers of the firm's assets in payment of firm debts.

*Second*—That there never was any transfer of these accounts, because the memorandum of transfer recited that they were assigned by Charles H. Flach & Company by Charles H. Flach, and that such transfer did not purport to be a transfer from Hopple, Flach & Company, and, therefore, failed to take effect as such.

As to the first ground relied upon, it must be admitted that there is a sharp conflict of authority upon the question of the right of one partner to transfer all the property of the firm, including the fixtures and the real estate, to the firm creditors; but the law is clear, I think, that one partner may transfer stock in trade, or book accounts of the firm, in payment of the firm's debts.   *McGreggor* v. *Ellis*, 2 Disney, 286; Bates on Partnership, sections 406, 408; *Mabbett* v. *White*, 12 N. Y. 442; Burrill on Assignments, page 68, note 2.

But whatever doubt may be entertained as to this last proposition, it seems to me that, under circumstances such as are present in this case, where one of the partners is dangerously sick, and it is impossible to consult him, and an emergency has arisen in the business which requires action, that one partner has the right to pay such firm debts as he prefers with the stock in trade or the book accounts.

Objection is made to this course, that it gives a preference to some creditors over others, and thus violates the maxim of equity that " Equity is Equality."

It cannot see any force in this objection.

In the case of *Cross, trustee* v. *Carstens*, 49 Ohio St. 569, our Supreme Court said, with reference to the right of an insolvent firm to give certain creditors a preference:

" In the many decisions upon the general subject, from *Atkinson* v. *Jordan*, to its last deliverance upon the question, (save in the overruled case of *Mitchell* v. *Gazzam*, 12 Ohio, 315), this court has not omitted to affirm the right of a debtor, in failing circumstances, in good faith, to pay or secure one or more creditors in preference to others.   (Citing authorities).   From an examination of these decisions it will appear clear, if decisions can establish anything, that it is established beyond question that however equitable it may seem to require the assets of an insolvent debtor to be distributed *pro rata* among his creditors, our statute fails to make compulsory provision for that end.   But, on the contrary, it permits preferences if made in good faith, though but little be left, or nothing at all be left, for other creditors equally meritorious."

Since the right of a firm is undoubted to give a preference to some of its creditors, it necessarily follows that when circumstances are such that a single partner may act in place of the firm, he may also give preferences to firm creditors.

Did the transfer fail by reason of defective execution ?

The transfers, which were entirely of book accounts, were made in the following manner:

An account was made out against each debtor of the firm of Hopple, Flach & Company, whose account was to be assigned, upon the bill forms

of Hopple, Flach & Company, with the name of that firm printed at the head of the same. Immediately above the words, " In account with Hopple, Flach & Company," there was stamped with a rubber stamp the words: "Charles H. Flach & Company, successors to;" and lower down upon the bill form, after the items of indebtedness had been stated, were the words: "For value received, we hereby sell and transfer the above account to Arbuckle Brothers," or "The Western National Bank," as the case might be.

These accounts thus endorsed and certified, were delivered into the hands of Mr. L. C. Black, as the attorney in fact of said bank and Arbuckle Brothers, he having been previously authorized by them to receive and receipt for the same.

The receipt given on behalf of the Western National Bank was as follows:

Cincinnati, *January* 2, 1895,

"Received from C. H. Flach & Co. in full payment of the two notes held by us against Hopple, Flach & Company and C. H. Flach & Company.

(Signed)       " Western National Bank of New York.

" *By* L. C. Black,
" *Its Agent and Attorney.*"

The notes were not at that time due.

In the case of Arbuckle Brothers, the following receipt was given by Mr. Black:

" Cincinnati, *January* 2, 1895.

" Received from C. H. Flach & Company the accounts contained in the foregoing list in full payment of the accounts held by us against C. H. Flach & Company and Hopple, Flach & Company.

(Signed),       " Arbuckle Brothers,

" *By* L. C. Black,
" *Their Attorney in Fact.*"

At the time these transfers were made, Mr. Black was aware of the agreement of December 10, 1894, and had no knowledge or information affecting the validity of the same ; and as both Mr. Flach and Mr. Black were of the opinion that the firm of Hopple, Flach & Company had been dissolved by the agreement of December 10, 1894, and that Flach had succeeded to the rights of Hopple, Flach & Company in said claims, the written evidence of assignment purported to assign them on behalf of Charles H. Flach & Company, (which was Charles H. Flach as successor to Hopple, Flach & Company.)

At common law *choses in action* were not assignable, but equity very early held them to be good. In this state, however, the assignment is good both in law and equity, and the assignee of an account becomes the legal owner of the same. Thus, in *Allen* v. *Miller*, 11 Ohio St. 377, the Supreme Court said :

" By the provisions of the code the assignee of an account is its legal holder ; his title is not a mere equitable title as before the adoption of the code, but a legal title. He holds it not with the incidents of inviolability, which attaches to commercial paper, it is true ; but still, as its legal holder, and as such is its *prima facie* representative as against the debtor."

See also, *Hooker* v. *Eagle Bank*, 38 N. Y. (3 Tiff.) 83.

The principle is also well settled that an assignment may be had orally as well as in writing. Thus, in *Croker et al.* v. *Whitney*, 10 Mass. 316, the court said :

" The first question, then, is whether this declaration sets forth a sufficient assignment by Head and the other seaman of their money in the defendant's hands. No precise form seems required for this purpose. In the cases cited, it was by an order or request in writing. But there appears to be no reason why it may not be as well affected by a verbal request or agreement."

"And the rules as to the assignment of book accounts is nowhere better stated than by Judge REDFIELD in *Whittle* v. *Skinner*, 23 Vt. 536, and *Spafford* v. *Page*, 15 Vt. 494. In the former case he said:

" So, too, when the assignment of an account is made, it has been held sufficient to deliver the bill. And when the assignment is in writing, the delivery of the writing would very likely be sufficient:

And in the latter case, he said:

" The question made in this case in regard to the validity of an oral assignment of a book debt to vest in the assignee the equitable interest can not, I apprehend, admit of doubt. Mr. Justice Story states the general doctrine thus (and he is sustained by all other writers on the subject, and by the adjudged cases) : 'Any order, writing or act which makes an appropriation of a fund, amounts to an equitable assignment of the fund.' 'An assignment of a debt may be by parol as well as by deed.' Equity Jurisprudence, Vol. 2, page 311. And if the assignment may be by parol, it is surely not important whether it be by writing or mere words.'

As the written transfers were signed " Charles H. Flach & Company, by Charles H. Flach," it may be contended that the transfer of these accounts were never made by Hopple, Flach & Company, nor by Mr. Flach as a partner of Hopple, Flach & Company, or, which is the same thing, by Charles H. Flach, and that, inasmuch as Hopple, Flach & Company were the real owners, and not Charles H. Flach, therefore there was either no transfer which took effect, or if any did take effect, it was merely that of the individual interest by Charles H. Flach in said accounts, which individual interest could only be the surplus remaining due to him after the partnership of Hopple, Flach & Company had been wound up.

The latter theory, I think, is entirely unsupportable, because the result of its adoption would be a transfer entirely contrary to the intent of both parties. Neither party bargained for a transfer merely of Flach's individual interest in the accounts after a settlement of the affairs of Hopple, Flach & Company. Such a transfer might transfer nothing, as we now know would be the case, or it might have transferred merely a certain per cent. of the value of the accounts. But Mr. Flach's intention was to transfer to the transferee an absolute ownership in the same. Neither did the transferees intend to accept these accounts with a qualified ownership which might greatly impair their value or reduce it to nothing. They would certainly have not released their indebtedness and surrendered their securities for such accounts.

There can, therefore, be no half way position taken with reference to the transfer of these accounts ; either absolute ownership of the same passed to the transferees, or there were no transfers.

The argument that there was no legal transfer is as follows: Mr. Flach and the transferees supposed he was the absolute owner of these accounts, and he transferred them as such, whereas, he was not the owner, and, therefore, the transfers fail.

In regard to this argument it may be said that it is true that Mr. Flach was supposed to be the absolute owner of these accounts, and that he was not. But, while this is true, it is also true that, as a partner of Hopple, Flach & Company, he was an owner, entitled to the right of possession and to transfer the accounts in payment of the debts of Hopple, Flach & Company. And it is also true that both he and the transferees understood that he was transferring them to pay such debts.

This latter statement may be denied, and it may be asserted that he was transferring them to pay the debts of Charles H. Flach & Company. But the fallacy in this assertion is apparent, The goods purchased, and the money loaned, which constituted the consideration for the indebtedness, was purchased of, and loaned by such creditors, to Hopple, Flach & Company. The subsequent agreement between Mr. Flach and Mr· Hopple, that Mr. Flach would assume the entire liability for these debts, only affected these two parties. The creditors were no party to the agreement, and never consented to release Mr. Hopple. In other words, notwithstanding the agreement of December 10th, the creditors of Hopple, Flach & Company remained their creditors. The relation of debtor and creditor, which existed between them, was not disturbed. They had no greater and no less rights than before that agreement was made. Mr Flach's agreement to assume a liability for the entire indebtedness did not increase his liability to these creditors. He was liable, as partner for the entire amount before the agreement was made, and remained so liable afterwards.

Mr. Flach, individually, was not the debtor of the creditors, nor was Charles H. Flach & Company, and both Mr. Flach and the transferees understood he was not paying the debt of Mr. Flach, or of Charles H. Flach & Company, but of Hopple, Flach & Company.

Did the transfers fail, then—although there was an actual and manual delivery of the accounts—simply because Mr. Flach supposed he had become the owner of the accounts, as the successor of Hopple, Flach & Company, although he was entitled to possession, entitled to the right to transfer in payment of the debts of Hopple, Flach & Company, and did transfer for that purpose?

What effect had the memorandum in writing? This memorandum was signed, "Charles H. Flach & Company, by Charles H. Flach." But the transfers of accounts are not required to be in writing; the delivery of the bills is sufficient, and this delivery was made in this case. The writing could not add to or impair the effect of the transfers if otherwise legally made, unless the belief upon the part of Mr. Flach which it evidenced, that at the time of the transfer, he was the owner of the accounts, destroyed the legal effect of the delivery of the same. It seems to me, however, that his belief that he owned the accounts absolutely, instead of owning them as a partner, is an immaterial circumstance which does not affect the validity of the transfers. In view of the facts that he transferred them to the creditors of Hopple, Flach & Company in payment of the debts of Hopple, Flach & Company, and that he undoubtedly had the right to transfer them for that purpose, not to sustain the transfers under such circumstances, would be, it seems to me, to sacrifice the substance and real nature of the transaction to a merely formal objection. This a court of equity will never do.

But if I am in error in regard to either of the positions heretofore taken, viz., (1), that one partner had the right to make these transfers, or (2), that he actually did make the transfers then the transfer to Arbuckle Brothers would probably fail. But the transfer to the Western National Bank of New York City, it seems to me, must unquestionably be sustained upon another ground not previously referred to.

The right of partnership creditors to subject the partnership assets to the payment of the firm debts is merely an equity which they derive through the partners who, between themselves, have this right. The principle is admirably expressed by the United States Supreme Court in *Case* v. *Beauregard*, 99 U. S. 124, where it is said :

"No doubt the effects of a partnership belong to it so long as it continues in existence, and not to the individuals who compose it. The right of each partner extends only to a share of what may remain after payment of

the debts of the firm and the settlement of its accounts. Growing out of this right. or rather, included in it, is the right to have the partnership property applied to the payment of the partnership debts in preference to those of any individual partner. This is an equity the partners have, as between themselves, and, in certain circumstances, it inures to the benefit of the creditors of the firm. The latter are said to have a privilege or preference, sometimes loosely denominated a lien, to have the debts due them paid out of the assets of a firm in course of liquidation, to the exclusion of the creditors of the several members. Their equity, however, is a derivative one. It is not held or enforceable in their own right. It is practically a subrogation to the equity of the individual partner, to be made effective only through him. Hence, if he is not in a condition to enforce it, the the creditors of the firm can not be. *Rice* v. *Barnard et al.*, 20 Vt. 479; *Appeal of the New York County Bank*, 32 Pa. St. 446. But so long as the equity of the partner remains in him, so long as he retains an interest in the firm assets as a partner, a court of equity will allow the creditors of the firm to avail themselves of his equity and enforce through it the application of these assets primarily to payment of the debts due them whenever the property comes under its administration. * * *

" So, if before the interposition of the court is asked, the property has ceased to belong to the partnership, if by a *bona fide* transfer it has become the several property, either of one partner or of a third person, the equities of the partners are extinguished, and consequently the derivative equities of the creditors are at an end. It is, therefore, always essential to any preferential right of the creditors that there shall be property owned by the partnership when the claim for preference is sought to be enforced."

By the agreement of December 10, 1894, and by the publication provided for therein, Mr. Hopple gave all persons who were creditors of Hopple, Flach & Company notice that Charles H. Flach & Company were authorized to pay the claims of Hopple, Flach & Company, to receive the evidence of indebtedness held by said creditors against said firm of Hopple, Flach & Company, and to receive releases from said creditors.

Thereafter where a transaction of payment and settlement takes place, such as was had between Charles H. Flach & Company and the Western National Bank, both Mr. Hopple and Mr. Flach would be estopped to set up any want of authority in the firm of Charles H. Flach & Company to make such settlement and transfer, if the bank by such settlement was a *bona fide* purchaser for valuable consideration, and could not now be restored to the position it was in before such settlement, without any injury to his rights.

There is no doubt that the transfer was made in good faith by Mr. Flach on behalf of the bank, without a knowledge of any infirmity of the title in said Charles H. Flach & Company. The sole question, therefore, is, did the bank give up a valuable consideration when it surrendered the notes?

The notes were not yet due. And assuming, for the purpose of argument, that the surrender of a mere pre-existing debt would not constitute such a valuable consideration as the law requires, yet it seems to me that in view of the particular circumstances under which the debt was contracted, there was a valuable consideration for the transfer ; that the partners are estopped to deny there was not, and that the creditors, whose rights are all derived from the partners, can not ask to have the transfer set aside on the ground of absence of valuable consideration therefor.

It appears, from the evidence, that on or about January, 1894, at the time it became necessary to renew the paper of Hopple, Flach & Company at the National Lafayette Bank, that the bank required Mr. Flach to make a statement of the resources and liabilities of the firm, in order that the

bank might be advised as to its condition, to enable it to determine wheth-er it would renew the paper. Without going into the details of the state-ment, it is sufficient to say that it was false, and must have been known to be so by Mr. Flach when he made it.

The National Lafayette Bank is not a party to this action, and the ref-erence I have just made to the statement made to it by Mr. Flach, has not been made in connection with the consideration of the validity of the transfer to that bank, because the validity of that transfer is not directly before me. But the reference is made to show that the making of a false statement to a bank would not be an improbable act on the part of Mr. Flach, if the necessities of the situation demanded it. We need have no hesitation, therefore, in believing what the evidence clearly shows, al-though the statement is not in evidence, that the statement to the West-ern National Bank, upon which statement he secured the loan of ten thousand dollars to Hopple Flach & Company, was false and fraudulent. The loan was made on promisssory notes, to which was attached the state-ment, and those papers were put in the hands of brokers, who, by means of them, secured the loan from the Western National Bank. The statement must not only have shown the firm to be solvent, but largely so; and such statement was false, and must have been made with full knowledge of its falsity.

Before proceeding to discuss the bearing of these facts upon the case, I shall call attention to two recent decisions of the United States Supreme Court.

The first case is that of *Leather Manufacturers' Bank* v. *Morgan*, 117 U. S. 114. It was there held that a depositor, whose checks had been fraudu-lently raised by his clerks, lost his remedy against the bank by his de-lay and negligence in making known the facts to the bank, and thus giv-ing it an opportunity to seek restitution from the wrong doer; and the following language was used:

"Still further, if the depositor was guilty of negligence in not discover-ing and giving notice of the fraud of his clerk, then the bank was thereby prejudiced, because it was prevented from taking steps by the arrest of the criminal, or by an attachment of his property, or other form of proceeding to compel restitution. It is not necessary that it should be made to ap-pear by evidence that benefits would certainly have accrued to the bank from an attempt to secure payment from the criminal. Whether the de-positor is to be held as having ratified what his clerk did, or to have adopt-ed the checks paid by the bank and charged to him, can not be made in this action to depend upon a calculation whether the criminal had, at the time the forgeries were committed, or subsequently, property sufficient to meet the demands of the bank. An inquiry as to the damages in money actually sustained by the bank by reason of the neglect of the depositor to give notice of the forgeries, might be proper if this were an action by it to recover damages for a violation of his duty. But it is a suit by the depos-itor, in effect, to falsify a stated account, to the injury of the bank, whose defense is that the depositor has by his conduct ratified or adopted the pay-ment of the altered checks, and thereby induced it to forbear taking steps for its protection against the person committing the forgeries. As the right to seek and compel restoration and payment from the person com-mitting the forgeries, was in itself a valuable one, it is sufficient if it ap-pears that the bank, by reason of the negligence of the depositor, was pre-vented from promptly, and it may be effectively, exercising it."

And in the recently decided case of *Robb* v. *Vos*, Supreme Court Rep., Vol. 15, No. 2, the same principle is declared.

That case grew out of the frauds well known in this county, and com-mitted by Charles A. Kebler, an attorney, who, without authority, entered the

appearance of Robb and Strong as trustees in an action to sell certain property upon which they held a lien, and which was, therefore, sold free from their claim as trustees.

In a subsequent action among the creditors of Kebler to subject his property to the payment of his debts, Robb and Strong filed a cross-petition and sought payment out of Kebler's estate. Yet, though they afterwards dismissed this cross-petition, the court held that they had by that act ratified the deeds done in their behalf, and by this means, for only a short period of time, they deprived the purchaser, at the judicial sale aforesaid, from proceeding against Kebler's estate to procure indemnity. The court, in deciding the case, said:

"The subsequent withdrawal of their answer and cross petition did not avail to put the parties in *statu quo*. Such withdrawal could not restore to the purchasers at the Gugenheim sale of their lost opportunity to pursue Kebler's estate. The right to seek such indemnity was a valuable one, and it is enough that it appears that if Robb and Strong, by acquiescing in Kebler's acts, and resorting to legal proceedings against his administrator and partner, prevented Vos and Stix from promptly and, perhaps, successfully pursuing their remedies against the criminal's estate."

There are three principles declared by these cases, with reference to these proceedings in equity, which have application here:

*First*—That the right to arrest for the commission of a crime, and to thus secure indemnity, is a valuable right, and that the suspension of this right or delay in the exercise of it is a damage to the one against whom the offense is committed.

*Second*—That where either the act or negligence of the one seeking relief in equity has been the cause of the suspension of such right, or the delay in its exercise, such person is estopped as against the one injured to assert that he has not been damaged by such suspension or delay.

*Third*—The damage presumed can not be disputed or denied by an inquiry as to whether such proceedings would have been profitable or not.

Now, in this case, the Western National Bank possessed the right from date of its loan up to January 2nd to have proceeded by arrest to have secured an indemnity. By the transaction of January 2d it surrendered this right, because it gave up its debts, and its notes were paid. It was no longer a creditor of Hopple, Flach & Company. The right to secure indemnity pre-supposes the existence of a debt to be indemnified. Payment obliterates a debt, and obliterates the right, therefore, to secure indemnity.

If this transaction is now set aside, the parties could not be restored to the status *quo ante*, because the right lost during the period of time from January 2nd up to the present time can not be restored.

But it may be said that the bank did not know of the fraud, and therefore would not have prosecuted, and, therefore, lost nothing.

But knowledge upon the part of the bank from January 2nd up to the present time is an element entirely immaterial in determining the rights of the parties, because, even it had such knowledge, it would not have acted upon it, inasmuch as, by reason of representation of Mr. Hopple that Mr. Flach had become the owner of the accounts, it received such accounts in payment of its debt.

Nor can Mr. Hopple be heard to say that if the transaction is set aside the position of the bank will not be any different than it

would have been if the transaction had not taken place, because the bank did not know, until the evidence in this case was submitted to it, that the statement made to it was false, and therefore it would never have proceeded by arrest to procure indemnity.

Mr. Hopple can not be allowed to take this position, for two reasons:

*First*—A damage to property is none the less real because the one whose property has been injured is not aware of the injury at the time it is inflicted. It can not be known what knowledge the bank might have sought and gained had it not rested in the belief that the debt was paid.

*Second*—Mr. Hopple is estopped to plead such want of knowledge upon the part of the bank, when, if he had not been negligent, the bank would have come into possession of this knowledge prior to the transfer of January 2nd. *Leather Manufacturers' Bank* v. *Morgan, supra.*

But it way be inquired what ground is there for holding that the failure of the bank to discover the falsity of the statement is due to the negligence of Mr. Hopple?

Each partner is the agent of the other in the transaction of partnership business; he owes a duty, therefore, with respect to those who deal with the partnership, to exercise a reasonable supervision over the conduct of his co-partner. What is a reasonable supervision is a question of fact dependent upon the circumstances of each case. But where in a business of the character of this business, with the relations to it which these partners bore, one partner entirely neglects it, allows his co partner to carry it on, to make statements to banks, to borrow money, and, in fact, to take the entire business out of his hands without making the slightest effort to inform himself as to what has been done, or what is being done, it seems to me that his conduct is negligent, and that he is estopped in equity to assert a want of knowledge which his diligence would have discovered, and disclosed. See *Leather Manufacturers' Bank* v. *Morgan*; *Martin* v. *Webb*, 110 U. S. 15; *Briggs* v. *Spaulding*, 141 U. S. 132; *Cutting* v. *Mahlor*, 78 N. Y. 454, 460; *Citizens' National Bank* v. *C., N. O. & T. P. Ry. Co.*, 29 W. L. B. 34.

It is contended by council for plaintiff, however, that there was no privity between Hopple, Flach & Company and the Western National Bank so far as any statements contained in the agreement of December 10th are concerned, because the bank was not a party to the agreement, and the statements therein contained were only intended for the parties thereto.

But this contention is not sound. The agreement was in part a transfer of personal property to define the title of such property, and, like all instruments conveying title, was intended, not alone to vest title, but to inform future purchasers of such fact, so that they might act in reference to the property with full knowledge as to its ownership.

And that such was the purpose of the instrument appears from the fact that it provides for publication as to its terms, in order that even those who never saw it might know its contents.

When, therefore, the statements contained in the agreement were addressed to purchasers such as the Western National Bank, and when its agent, Mr. Black, relied upon such statements, and acted upon them as the parties contemplated should be done when the statements were inserted in the instrument, the law will protect them. Such reliance is not similar to that of one who acts upon a statement which he hears, but which is not addressed to him.

The claim of D. A. White & Company, for about twenty-one hundred dollars, is composed of two different items, one for about nine hundred dollars, representing the value of goods sold to Hopple, Flach & Company, and another of twelve hundred, representing goods sold to Charles H. Flach & Company.

So far as the latter item of twelve hundred dollars is concerned, the claim is clearly good, it seems to me, upon a different ground than that of any other claim in the case, because the transfer, to that extent, was not in payment of a pre-existing debt, it having been incurred subsequent to the execution of the written instrument of December 10 by the firm of Charles H. Flach & Company.

It is contended, however, that the court has no jurisdiction of this case, because of the assignment, in the probate court, of Charles H. Flach & Company, or Charles H. Flach, and that the rights of the parties to this case must be worked out in that court, which has exclusive jurisdiction of the same.

We have seen, however, that Charles H. Flach & Company, or Charles H. Flach individually, has made an assignment, and that, during the progress of the trial, R. B. Hopple, individually, has made an assignment, but there has been no assignment of the firm of Hopple, Flach & Company. Under these circumstances, I am at a loss to see why this court has not jurisdiction to proceed to inquire whether the transfer made by Charles H. Flach of the partnership property of Hopple, Flach & Company in payment of his individual debts were not transactions that were void as to the partnership creditors.

Section 6344, Revised Statutes, provides that "all transfers, conveyances or assignments made by a debtor, or procured by him to be made, with intent to hinder, delay or defraud creditors, shall be declared void at the suit of any creditor." And it would seem that, by virtue of this section, the creditors would have the right to proceed in this court to have such transfer set aside.

But whether such position is correct or not, it seems to me that their right to proceed here may be sustained, for the reason that the individual assignment of a partner does not carry with it any of the partnership assets, but only the surplus which is due to the individual partner after the partnership affairs had been settled.

In *Moddewell* v. *Kiefer*, 8 Watts and Sergeant, (Pa.) 63, it was held that a general assignment for the benefit of creditors by one who was a member of a partnership gave to his assignee no control over a partnership funds or claims so as to enable him to receive or release them.

Notwithstanding, therefore, an assignment of an individual partner, the assignee has no right to receive or release claims of the partnership, and it therefore necessarily follows that one of the partners would have a right in equity, or a creditor acting through him, to set aside any transfers of the partnership property, which, either actively or constructively, are in fraud of the partnership.

Whether this court, however, should proceed to appoint a receiver of these claims, or whether the transfers are governed by the provisions of section 6344, in which case it would be the duty of the court to certify its judgment to the probate court, and for that court to appoint a trustee, as provided by the chapter relating to insolvent debtors, is a question which I do not now determine, but reserve for future determination when the entry shall be handed up in this case.

My conclusion upon the entire case, therefore, is, that the transfers to the Western National Bank of New York, to Arbuckle Brothers, of New York, and to D. A. White & Company, of Cincinnati, are valid; that the transfers to Bertha Flach, and to Charles H. Flach, guardian of Julia W. Hopple, are invalid, and that, as to Charles Fleischmann, the case will be continued for further determination upon the question as to whether he is a creditor of the firm of Hopple, Flach & Company, or an individual creditor of Charles H. Flach.

*Wilby & Wald*, for Fourth National Bank; *Thomas McDougall*, for R. B. Hopple; *Edward Colston*, for Western National Bank and Arbuckle Brothers; *John F. Follett*, for Lafayette National Bank.

*Louis Kramer*, for Bertha Flach, Charles H. Flach, guardian, and Charles Fleischmann; *Daniel Wilson*, for D. A. White & Co.

Subsequently the court appointed Mr. L. C. Black as Receiver of the accounts, whose transfers were held to be invalid.